**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW SCHAMAUN, derivatively on behalf of RIVIAN AUTOMOTIVE, INC., | Case No. |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| ROBERT J. SCARINGE, CLAIRE MCDONOUGH, KAREN BOONE, SANFORD SCHWARTZ, ROSE MARCARIO, PETER KRAWIEC, JAY FLATLEY, JOHN KRAFCIK, and PAMELA THOMAS-GRAHAM, | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants, | |
| and | |
| RIVIAN AUTOMOTIVE, INC., | |
| Nominal Defendant. | |

1

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Andrew Schamaun ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Rivian Automotive, Inc. ("Rivian" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding Rivian, legal filings, news reports, securities analysts' reports about the Company, filings in the securities class actions captioned *Indiana Public Retirement System v. Rivian Automotive, Inc., et al.*, No. 2:24-cv-04566-CBM-PVC (C.D. Cal.) (the "*IPRS* Action"), and other publicly available information.

## **NATURE OF THE ACTION**

1. This is a shareholder derivative action brought by Plaintiff on behalf of Rivian against certain officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties and violations of the federal securities laws between at least August 12, 2022 and February 21, 2024, inclusive (the "Relevant Period.")

2. Rivian is an automotive company that designs, develops, and manufactures electric vehicles ("EVs") and related accessories, selling them directly to consumer and

---

[1] The Individual Defendants are Robert J. Scaringe ("Scaringe"), Claire McDonough ("McDonough"), Karen Boone ("Boone"), Sanford Schwartz ("Schwartz"), Rose Marcario ("Marcario"), Peter Krawiec ("Krawiec"), Jay Flatley ("Flatley"), John Krafcik ("Krafcik"), and Pamela Thomas-Graham ("Thomas-Graham"). The Individual Defendants, together with Rivian, are herein referred to as "Defendants."

2

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

commercial customers. Rivian went public through an initial public offering ("IPO") completed on November 10, 2021, which raised $13.7 billion from investors — the seventh largest IPO in U.S. history.

3.      A key component of Rivian's IPO valuation was its promise of feature-packed electric vehicles that were highly competitive with established competitors like Tesla, Inc. ("Tesla"). Rivian's flagship R1 Platform—the R1T electric pickup truck and the R1S electric SUV were first unveiled at the 2018 Los Angeles Auto Show. The Company set base prices of $69,000 for the R1T and $72,500 for the R1S, to be competitive with Tesla. These competitive prices drove over 55,000 pre-orders and further contributed to Rivian's massive valuation in the IPO.

4.      However, prior to going public in November 2021, the Individual Defendants knew that the actual cost of producing the R1 Platform significantly exceeded the publicly announced retail prices, thereby making profitability impossible without substantial price increases. Nevertheless, the Company's offering documents filed with the SEC portrayed Rivian's products and financial prospects in optimistic terms, emphasizing demand, innovation, and scalability, while omitting the material fact that the vehicles' bill-of-materials ("BOM") costs rendered the announced pricing unsustainable. Rather than disclosing the problem, the Company merely described potential price adjustments as a "risk", thereby framing the pricing changes as merely hypothetical rather than inevitable.

5.      In the months following the IPO, Rivian's senior executives, including Defendants Scaringe and McDonough reassured investors that the Company was merely "evaluating" pricing in light of inflation and demand, thereby supporting the false impression that Rivian's financial model remained sound. In truth, the Individual Defendants knew that the R1 Platform had unsustainable prices and already internally decided to raise prices.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

6. On March 1, 2022, Rivian suddenly announced a 17% price increase for the R1T and a 20% increase for the R1S. Worse yet, Rivian announced these hikes applied even to pre-existing orders. This announcement triggered immediate outrage among customers, which forced the Board to reverse course and honor the original prices for the early pre-order customers. This reversal came at the cost of hundreds of millions of dollars in lost revenue.

7. When Rivian subsequently reported negative gross profits and billions of dollars in projected losses, the Company's stock price plummeted. From the close of trading on March 2, 2022, to the close of trading on March 10, 2022, Rivian's Class A common stock fell from $53.56 per share to $41.16 per share.

8. After trading closed on March 10, 2022, the market learned the truth—Rivian's long-term financial prospects had been impacted by its undisclosed need to reprice its EVs. According to Rivian's disclosures, the Company's projected earnings for fiscal year 2022 were a disappointing $4.75 billion loss, and the Company would face negative margins as it "continue[d] to ramp-up [its] manufacturing facility, manage supply chain challenges, face continued inflationary pressures, and minimize price increases to customers in the near term."

9. On this news, the Company's stock fell from almost 8%, from a close of $41.16 per share on March 10, 2022, to a close of $38.05 per share on March 11, 2022. The stock continued to fall precipitously to $35.83 per share — less than half of its $78 per share IPO price.

10. As a result of this unlawful conduct, in March 2022, *Crews v. Rivian Automotive, Inc., et al.,* No. 2:22-cv-01524-JLS-E (C.D. Cal.) (the "*Crews* Action") was filed in the U.S. District Court for the Central District of California on behalf of investors who purchased Rivian's shares.[2]

---

[2] In July 2023, the court in the *Crews* Action denied the defendants' motion to dismiss in its entirety. On October 23, 2025, the plaintiffs in the *Crews* Action filed a motion for

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

11. Following this news, the Individual Defendants repeatedly represented to the market that Rivian could emerge from its growth phase as a sustainable company based on the fundamentals of its business — producing and selling a high volume of EVs for profit.

12. The Individual Defendants sought to assuage investors' fears by unveiling a roadmap to achieve gross margin profitability by 2024 (the "Roadmap").

13. Rivian's Roadmap is premised on three drivers: (1) ramping-up production; (2) reducing costs; and (3) increasing pricing. Throughout the Relevant Period, Defendants Scaringe and McDonough repeatedly represented that production was the most important driver for Rivian's path to profitability. The Individual Defendants signaled that their best chance to reduce costs was by leveraging an economy of scale and thus sought to desperately ramp-up vehicle production.

14. However, this strategy depended on there being enough demand for Rivian's EVs, and on Rivian being able to meet that demand by selling those EVs at a profit. The Individual Defendants represented to investors that the demand for its products remained strong since it had a backlog of approximately 114,000 preorders for the R1 in addition to a potential 100,000 EDV ("electric delivery van") orders from Amazon.

15. Throughout the Relevant Period, the Individual Defendants materially misrepresented that Rivian was on track to achieve gross margin profits in 2024, primarily by increasing the production and sales of its EVs. Beginning in August 2022, the Individual Defendants repeatedly hyped the market about Rivian's long-anticipated profit roadmap with data that they "closely watched" "daily," but did not disclose to investors. The Individual Defendants further claimed that this data gave them "clear visibility" into the

---

preliminary approval of a settlement for $250 million—$183 million of that amount which will be paid directly by Rivian. The settlement was subsequently approved by the court on December 18, 2025.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

"strong demand" for Rivian EVs that lasted "deep into 2024." At the same time, the Individual Defendants repeatedly reassured the market that Rivian was unscathed by macroeconomic factors impacting the EV industry, which had weakened demand and reduced prices for competitors.

16.     The truth came out on February 21, 2024, when Rivian disclosed that its production in 2024 would be even worse than its disappointing production figures released in 2023. In truth, the long-touted "strong" and "resilient" demand for Rivian EVs had evaporated, and Rivian revealed that it was suffering from the same macroeconomic factors as its peers. Defendants Scaringe and McDonough then blindsided the market by suddenly announcing that Rivian would have to radically change its profit roadmap by materially reducing the role of production — thereby conceding that its fundamentals still could not demonstrate a sustainable business model in 2024 and causing Rivian's stock to plummet once again.

## **JURISDICTION AND VENUE**

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein under Section 14(a), 15 U.S.C. § 78n(a)-1 and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

21.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Rivian is headquartered in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, the *Crews* Action that was resolved in this District, and the *IPRS* Action, which is pending in this District.

## PARTIES

### *Plaintiff*

22.     Plaintiff is, and has been at all relevant times, a continuous shareholder of Rivian.

### *Nominal Defendant*

23.     Nominal Defendant Rivian is a Delaware corporation with its principal executive offices located at 14600 Myford Road, Irvine, California 92618. Rivian's common stock is traded on the Nasdaq under the ticker symbol "RIVN."

### *Individual Defendants*

24.     Defendant Scaringe is the founder of Rivian and has served as a director and Chief Executive Officer ("CEO") since 2009. Defendant Scaringe was designated as chairman of the Board in March 2018. According to the proxy statement filed on Schedule 14A with the SEC on April 29, 2025 (the "2025 Proxy Statement"), for the 2024 fiscal year, Defendant Scaringe received $14,892,215 in total compensation from the Company.

25.     Defendant McDonough has served as Chief Financial Officer ("CFO") of the Company since 2021. According to the 2025 Proxy Statement, for the 2024 fiscal year, Defendant McDonough received $8,171,929 in total compensation from the Company.

26.     Defendant Boone has served as a director of the Company since August 2020. Defendant Boone serves as Chair of the Audit Committee and as a member of the

7

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company's Compensation Committee. According to the 2025 Proxy Statement, for the 2024 Fiscal Year, Defendant Boone received $376,948 in total compensation from the Company.

27.   Defendant Schwartz has served as a director of the Company since September 2019. Defendant Schwartz also serves as a chair of the Compensation Committee and as a member of the Planet and Policy Committee. According to the 2025 Proxy Statement, for the 2024 fiscal year, Defendant Schwartz received $355,486 in total compensation from the Company.

28.   Defendant Marcario served as a director of the Company from January 2021 until January 1, 2026. Defendant Marcario served as Chair of the Planet and Policy Committee and as a member of the Nominating and Governance Committee. According to the 2025 Proxy Statement, for the 2024 fiscal year, Defendant Marcario received $356,343 in total compensation from the Company.

29.   Defendant Krawiec has served as a director of the Company since February 2019. According to the 2025 Proxy Statement, for the 2024 fiscal year, Defendant Krawiec received $322,771 in total compensation from the Company.

30.   Defendant Flatley has served as a director of the Company since May 2021. Defendant Flatley serves as a member of the Audit Committee and the Compensation Committee. According to the 2025 Proxy Statement, for the 2024 fiscal year, Defendant Flatley received $338,631 in total compensation from the Company.

31.   Defendant Krafcik has served as a director of the Company since July 2023. Defendant Krafcik serves as a member of the Audit Committee and as Chair of the Nominating and Governance Committee. According to the 2025 Proxy Statement, for the 2024 Fiscal Year, Defendant Krafcik received $339,544 in total compensation from the Company.

8

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

32.    Defendant Thomas-Graham served as a director of the Company from August 2021 to June 2024, and as a member of the Audit Committee from at least October 2021 to July 2023. According to the proxy statement filed on Schedule 14A with the SEC on April 29, 2024 (the "2024 Proxy Statement"), for the 2023 fiscal year, Defendant Thomas-Graham received $356,484 in total compensation from the Company.

33.    Non-Party Director Aidan Gomez ("Gomez") has served as a director of the Company since April 2025. Gomez is named herein solely for the purposes of demand futility. Gomez serves as a member of the Audit and Finance Committee. Gomez participates in the same compensation plans as the other non-employee members of the Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

34.    By reason of their positions as officers and/or directors of Rivian, and because of their ability to control the business and corporate affairs of Rivian, the Individual Defendants owed Rivian and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Rivian in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Rivian and its shareholders.

35.    Each director and officer of the Company owes to Rivian and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

36.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Rivian, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

37. To discharge their duties, the officers and directors of Rivian were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

38. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Rivian, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

39. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

40. To discharge their duties, the officers and directors of Rivian were required to exercise reasonable and prudent supervision over the management, policies, practices,

10

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and internal controls of the Company. By virtue of such duties, the officers and directors of Rivian were required to, among other things:

    a. Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of California and the United States, and pursuant to Rivian's own Code of Business Conduct and Ethics;

    b. Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

    c. Remain informed as to how Rivian conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

    d. Establish and maintain systematic and accurate records and reports of the business and internal affairs of Rivian and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

    e. Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Rivian's operations would comply with all applicable laws and Rivian's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

    f. Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

g. Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h. Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

41. Each of the Individual Defendants further owed to Rivian and the shareholders the duty of loyalty requiring that each favor Rivian's interests and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

42. At all times relevant hereto, the Individual Defendants were the agents of each other and of Rivian and were at all times, acting within the course and scope of such agency.

43. Because of their advisory, executive, managerial, and directorial positions with Rivian, each of the Individual Defendants had access to adverse, non-public information about the Company.

44. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Rivian.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

45. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The

12

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

46.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

47.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

48.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Rivian, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

49.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

50.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Rivian and at all times acted within the course and scope of such agency.

13

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## THE CODE OF BUSINESS CONDUCT AND ETHICS

51.     Rivian's Code of Business Conduct and Ethics (the "Code of Conduct") sets out the basic principles that it expects "all directors, officers, leaders, and employees to follow."

52.     With respect to the Company's commitment to ethical business practices, the Code of Conduct states, in relevant part:

> It is core to who we are as a company to conduct business ethically and in-compliance with the law. This is the right thing to do, builds trust with our customers and helps us avoid situations that might lead to adverse legal consequences or damage to our hard-earned reputation. This [Code of Conduct] sets forth the expectations for how we do business. It's what we stand for and what we expect from ourselves, each other, and those with whom we do business.

53.     In a section titled "Maintain Records Accurately" the Code of Conduct provides, in relevant part:

> Accurate recordkeeping and reporting is necessary to meet accounting, legal and regulatory requirements. Maintaining financial integrity is essential and reflects positively on our reputation and credibility. As a public company, Rivian is subject to various securities laws, regulations and reporting obligations. Both U.S. federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations, and inaccurate, incomplete or untimely reporting can severely damage the Company and result in legal liability. Each of us—at every level—has a responsibility for ensuring the accuracy of all Company business and financial records.

> From quality assurance records, budget forecasts and regulatory filings, to emails, timesheets, benefit claim forms and expense reports, we all handle Company records. Be sure to follow all internal processes, record retention requirements, policies and generally accepted accounting principles so that our records accurately reflect all transactions. Be honest, accurate, timely and complete in everything you record.

14

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

54.     In a section titled "We build transparent relationships," the Code of Conduct states, in relevant part:

Building relationships with suppliers, customers and other business partners is an ongoing process and requires an enduring commitment to high standards of business conduct. In every interaction we have with these third parties, we must demonstrate honesty and a commitment to our values. Just one deceptive or dishonest act can seriously damage a relationship.

Everything we tell our customers, suppliers and other business partners must be truthful, including our advertising and other communications. Do not engage in any unfair, deceptive or misleading practices.

55.     In a section titled "We compete fairly" the Code of Conduct provides, in relevant part:

Deal honestly and fairly with our customers. Be truthful about Rivian and what we sell. Do not make any claims the Company cannot support or substantiate, and do not make inaccurate remarks about our competitors or erroneous comparisons between their products and ours.

## THE AUDIT COMMITTEE CHARTER

56.     Pursuant to Rivian's Audit Committee Charter, the Audit Committee is required to oversee the Company's financial statements, accounting and financial reporting processes and system of internal controls over financial reporting of the Company and its audits, as well as the risk management process.

57.     The Audit Committee Charter lays out the following responsibilities of the Audit Committee:

A. Financial Statements and Financial Reporting

(i)      Review significant accounting and reporting issues, including complex or unusual transactions and highly judgmental areas, and

15

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

recent professional and regulatory pronouncements, and understand their impact on the Corporation's financial statements.

(ii)     Review and discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

(iii)    Review and discuss the Corporation's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

(iv)    Provide the Corporation with the report of the Audit Committee with respect to the audited financial statements for inclusion in each of the Corporation's annual proxy statements.

B.  Risk Management and Compliance

(i)     Review with management the Corporation's major financial risk and enterprise exposures, as well as cybersecurity, data and privacy related risks, and the steps management has taken to mitigate such exposures, including the structure, design, adoption and implementation of the Corporation's risk management policies and internal control systems.

(ii)    Review with management the Corporation's cybersecurity and other information technology risks and management's operation of the Corporation's cybersecurity risk management program.

(iii)   Review the scope of the internal and independent auditors' assessment of internal control over financial reporting, and ***obtain reports on any significant deficiencies and/or material weaknesses***, together with recommendations and management's responses.[3]

(iv)    Review and provide oversight with respect to the Corporation's policies and procedures for the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or auditing matters.

C.  Independent Auditor

---

[3] All emphasis is added unless otherwise stated.

16

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(i)    Directly approve the appointment, retention, termination, compensation, terms of engagement of and oversee the work of the independent auditor and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Corporation. The independent auditor and each such other registered public accounting firm must report directly to the Audit Committee.

(ii)    Pre-approve any audit and non-audit service provided to the Corporation by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Audit Committee or if such service falls within available exceptions under SEC rules.

(iii)    Oversee the resolution of any disagreements between management and the independent auditor regarding financial reporting.

(iv)    Review and confirm the independence of the independent auditor by ensuring that the independent auditor prepares and delivers, at least annually, a written statement delineating all relationships between the independent auditor and the Corporation, actively engaging in a dialogue with the independent auditor with respect to any disclosed relationships or services that, in the view of the Audit Committee, may impact the objectivity and independence of the independent auditor, and, if the Audit Committee determines that further inquiry is advisable, taking appropriate action in response to the independent auditor's report to satisfy itself of the auditor's independence.

(v)    Discuss with the independent auditor any audit problems or difficulties and management's response.

D.  Other Responsibilities

(i)    Review and approve management's hiring policies for employees or former employees of the Corporation's independent auditor.

(ii)    Review all related person transactions as defined by Item 404 of Regulation S-K on an ongoing basis and approve or ratify all such transactions.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(iii)  Coordinate the Board of Directors' oversight of the Corporation's Code of Business Conduct and Ethics (the "Code") and monitor the procedures in place to enforce the Code.

(iv)  Report regularly to the Board of Directors as to the Audit Committee's activities.

(v)  Review and assess the adequacy of this Charter annually and recommend any proposed changes to the Board of Directors for approval.

(vi)  Evaluate the Audit Committee's performance on a periodic basis.

## **SUBSTANTIVE ALLEGATIONS**

*Background*

58.  Rivian was founded in 2009 by Defendant Scaringe under the name Mainstream Motors. In January 2017, the Company purchased a former Mitsubishi manufacturing plant in Normal, Illinois. In December 2017, Rivian announced its plans to produce an electric truck and SUV in 2020 and 2021, respectively, with both vehicles built on an in-house platform, and featuring autonomous driving capabilities.

59.  In 2018, the Company launched a publicity campaign regarding its base models, offering exclusive media previews that claimed luxury-level performance, off-road capabilities and battery ranges of 200 to 450 miles. This campaign generated significant media attention and culminated in the debut of Rivian's concept vehicles at the November 2018 LA Auto Show, marking Rivian's emergence as a high-profile EV contender.

60.  During the show, Rivian introduced the R1T and R1S as electric "adventure vehicles," with a range of more than 400 miles, and containing a plethora of unique features. Rivian claimed that the vehicles offered a balance of rugged utility and high-end comfort, with interiors benchmarked against luxury automakers. The initial retail prices for the base R1T and R1S were set at $69,000 and $72,000 respectively.

61.  In April 2020, Rivian announced that customer deliveries of the R1T and R1S would be postponed until 2021, attributing the delay to COVID-related shutdowns that

18

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

stalled construction at its Normal, Illinois plant. In a July 2020 email to customers, Defendant Scaringe confirmed that Rivian expected to launch R1T deliveries in June 2021, and R1S deliveries in August 2021.

62.     Rivian's first customer vehicle wasn't produced until September 14, 2021. The company attempted to ramp up production but produced a mere 12 R1Ts by September 30, 2021.

63.     Then, in November 2020, the Company officially set the base prices of the R1T and R1S at $67,500 and $70,000, respectively.

***Rivian's IPO***

64.     On October 1, 2021, Rivian filed an Form S-1 registration statement with the SEC for its IPO (the "IPO Registration Statement"), which was signed by Defendants Scaringe, McDonough, Boone, Schwartz, Marcario, Krawiec, Flatley, and Thomas-Graham.

65.     On November 12, 2021, Rivian filed with the SEC a Prospectus for the IPO (the "IPO Prospectus" together with the IPO Registration Statement, the "IPO Materials"), which was signed by Defendants Scaringe, McDonough, Boone, Schwartz, Marcario, Krawiec, Flatley and Thomas-Graham. In the IPO, the Company initially sold approximately 153 million shares of common stock at $78 per share, raising approximately $11.9 billion in proceeds. After full exercise of the underwriters' over-allotment option, the total gross proceeds from the offering increased to approximately $13.7 billion.

***Representations Regarding Rivian's Competitive Strengths and Expansion to Meet Demand***

66.     In the IPO Prospectus, Defendants Scaringe, McDonough, Boone, Schwartz, Marcario, Krawiec, Flatley, and Thomas-Graham represented the following with respect to the Company's production capabilities:

19

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Based on our current production forecast, we expect to fill our preorder backlog of approximately 55,400 R1 vehicles by the end of 2023. Our manufacturing facility in Normal, Illinois (the "Normal Factory") is currently equipped to produce up to 150,000 vehicles annually (distributed between the R1 platform, which will be used to produce the R1T and R1S, and the RCV platform, which will be used to produce EDVs and other commercial vehicles), when the equipment is operated at full rate and on multiple shifts. The current annual installed capacity for the R1 platform and RCV platform is approximately 65,000 and 85,000 vehicles, respectively. We produced 104 R1T vehicles during the last week of October 2021, representing approximately 8% of our target R1 production rate. Our target is to produce approximately 1,310 R1 vehicles a week, which when annualized (assuming 49.6 working weeks per year), equates to the current installed R1 platform capacity of approximately 65,000 R1 vehicles annually. With respect to the RCV platform, our target is to produce approximately 1,710 commercial vehicles (including EDVs) a week, which when annualized (assuming 49.6 working weeks per year), equates to the current installed RCV platform capacity of approximately 85,000 vehicles annually. We expect our vehicle production rate will improve as we continue to increase the speed of the line, hire and train employees to run additional shifts, commence production of the R1S and EDVs, and increase the rate of purchased materials from our supply chain. We expect to reach a vehicle production rate, which, when annualized, would result in us using 100% of the facility's current installed capacity of up to 150,000 vehicles by late 2023.

67.     Based on these representations of production capacity, the Individual Defendants touted that Rivian is expected to fill its "preorder backlog of approximately 55,400 R1 vehicles by the end of 2023."

68.     The IPO Materials also emphasized the competitive advantages of Rivian, including customer loyalty as evidenced by the substantial number of preorders for its vehicles. The Company credited its growth largely to the personal touch it added to tailoring vehicles, which built customer satisfaction and direct customer relationships, or the "Rivian Advantage," which is described by the IPO Materials as: "Our direct relationships with customers allow us to gather insights, design solutions that best serve their needs,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

drive strong engagement, remove structural inefficiencies, create transparency, and increase customer satisfaction and referrals." To achieve long-term growth, the Company stresses that a key component for its success hinges on its ability to offer "***additional vehicle variants across a broader set of price points supported by scale-driven supply*** chain efficiencies, further vertical integration, and technology advancements."

69.    On December 17, 2021, the Company filed a with the SEC its Quarterly Report on Form 10-Q, which contained certifications made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Scaringe and McDonough, attesting to the accuracy of the statements contained therein. The Form 10-Q updated stockholders on the Company's production progress and its expansion efforts to meet demand:

> In the consumer market, we launched the R1 platform with our first generation of consumer vehicles, the R1T, a two-row five-passenger pickup truck, and the R1S, a three-row seven-passenger sport utility vehicle ("SUV"). As of September 30, 2021, we produced 12 R1Ts and delivered 11 R1Ts, and as of December 15, 2021, we have produced 652 and delivered 386 R1 vehicles, including the production and sale of our first two, recently certified, R1S vehicles. As of December 15, 2021, we had approximately 71,000 R1 preorders in the United States and Canada from customers who each paid a cancellable and fully refundable deposit of $1,000.

> \*\*\*

> We intend to expand our operations significantly, which will require hiring, retaining and training new personnel, controlling expenses, establishing facilities and experience centers, and implementing administrative infrastructure, systems, and processes. For example, we currently plan to expand our manufacturing and supply chain operations into international markets, and we are planning to build a second manufacturing plant in Georgia beginning in the summer of 2022.

70.    On the same day, Rivian held a conference call with financial analysts and investors regarding Rivian's reported third-quarter financial results. Defendant Scaringe

21

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

represented that Rivian was ramping up production and that any supply-chain issues would be short-term. Scaringe stated that the Company expected to fall "a few hundred vehicles short" of its 2021 production target of 1,200. The Company said it faced supply chain issues as well as challenges ramping up production of the batteries that power the vehicles.

71. Defendant Scaringe assured investors that the company did not face any long-term, systemic issues in its supply chain:

> **The good news is we do not believe any of our supply chain challenges represent long-term systemic issues.** While our product development and manufacturing teams have been focused on ramping our normal production facility, our real estate and facilities team have been working diligently to ensure we remain well-positioned to capture and drive the accelerated large-scale adoption of sustainable transportation.

72. During the conference call, Defendant McDonough described supply chain issues as temporary and represented that the Company was working to build up its "inventory balance to help mitigate the supply chain challenges we have experienced today."

**Rivian Announces Price Increases**

73. On January 10, 2022, Rivian announced that it had produced only 1,015 vehicles in 2021 and delivered only 920 vehicles. Then, on March 1, 2022, less than two months after disclosing its disappointing production and delivery rates, Rivian announced that the prices of the R1T and R1S were rising by 17% and 20%, respectively, and that the new prices would apply to nearly all reorders. This reflected a change from $67,500 to $79,500 for the R1T and a change from $70,000 to $84,000 for the R1S.

74. In an email statement, Rivian's Chief Growth Officer Jiten Behl ("Behl") blamed inflation, supply chain issues, and component price increases:

> Like most manufacturers, Rivian is being confronted with inflationary pressure, increasing component costs, and unprecedented supply chain shortages and delays for parts (including semiconductor chips).

22

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

\*\*\*

> This rise in cost and complexity due to these challenging circumstances necessitate an increase to the prices of the R1T and R1S models we offer today — prices which were originally set in 2018.

75.     Through an email statement to pre-order customers, Rivian informed them that they were forced to pay $6,000 more for a larger battery pack, that the vehicle would only be available in a seven-seat configuration, and that the Company was raising prices for the pre-ordered vehicles.

76.     An article published on *Electrek*, a news website dedicated to electric transportation and sustainable energy, reported that Rivian left customers with the choice to "either accept a significantly lower spec vehicle that won't arrive until 2024 at the earliest or pay much [sic] more for the reservation you already made. Neither choice sounds great."[4] The Company's announcement caused customers to cancel their preorders in droves.

77.     On March 11, 2022, Rivian's stock price fell 8%, from a close of $41.16 per share on March 10 to $38.05 per share at the end of March 11 and continued to fall to $35.83 at the close of trading on March 14, 2022 — less than half of the $78 per share IPO price.

***The Company's False and Misleading Statements About its Path to Profitability***

78.     In response to the fierce customer backlash from the abrupt price increases on the R1T and R1S vehicles, Rivian scrambled to begin filling backlog orders that were placed before March 1, 2022, at the original pricing. A March 3, 2022, analyst report from RBC estimated that "[t]he roll-back on pricing is costing [Rivian] ~$850mm in revenue

---

[4] Fred Lambert**,** *Rivian Announces 2 Motor and Smaller Battery Options, Config Updates, and Steep $12,000+ Price Increase*, Electrek (Mar. 1, 2022), https://electrek.co/2022/03/01/rivian-prices-increases-many-electric-pickup/(last accessed 2/25/2026).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(assuming no cancellations)." Rivian now was in a race against time to prove to customers and investors that its business was sustainable and could become profitable.

79. On August 11, 2022, the Company filed with the SEC a Quarterly Report on Form 10-Q, reporting its second quarter financial results. That Quarterly Report was signed by Defendants Scaringe and McDonough and contained SOX certifications, signed by Defendants Scaringe and McDonough, attesting to the accuracy of the statements contained therein. Rivian also filed a Current Report on Form 8-K that day and attached its Q2 2022 Rivian Shareholder Letter as an exhibit thereto. In this letter, the Company emphasized the need to ramp up production to meet "strong demand" for its products: "We remain focused on fully ramping our 150,000 installed annual units of capacity in Normal, Illinois to meet the strong demand for our products."

80. During the related earnings call to discuss the second quarter financial results, Defendant Scaringe emphasized that Rivian had about 98,000 net preorders for the R1 platform and stated that there was "continued strong demand" for products and that the daily preorder rate had accelerated. Defendant Scaringe added that the Company remained focused on ramping up production at its Normal, Illinois facility to reach 150,000 units of annual capacity. Defendant Scaringe saw this strong order book as evidence of robust demand.

81. When asked about the Company's plan to achieve "positive gross margin" Defendant McDonough stated the following:

> I wanted to hit on your first question ***in terms of what that path to positive gross profit and positive unit economics looks like for Rivian in particular.*** As you called out, right, we have seen unprecedented levels of inflation, especially across our raw material inputs and lithium prices that have gone up north of 115% over – since the start of this year, in particular, coupled with COVID and other factors that have driven a challenging supply chain and inflationary environment as well as part of that.

24

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

But as we look out to the future, as I mentioned in my prepared remarks, *we have significant confidence in the long-term gross profit margin targets that we've set out for ourselves of approximately 25%*. And I will give you a little bit of that path as we see from today going from our current state to that future state of positive unit economics.

We see 2024 as really that pivotal year for us in driving a step change in terms of the underlying gross margin expectations within the business, as we have a couple of significant factors that are starting to impact our underlying unit economics. *First and foremost, it's really driven by us ramping our plants and our productivity within our 150,000 units of installed capacity within Normal that allows us to really leverage all of those fixed overhead and costs associated with our large-scale production facility.*

Second, it's also our ability to introduce our next-generation technologies into our vehicles, first in our R1 products as well as in our EDVs. So those are things like in-sourcing of our motors, the introduction of our LFP pack, which will be introduced first in our commercial vehicles, that allow us to really drive a step change in terms of vehicle performance in that time frame, which enables us to increase pricing on the vehicles, given the fact we will have vehicles with added range and added performance and capabilities, but they also importantly drive significant cost-downs within our bill of materials as we look at that roadmap ahead.

And then finally, the other core factor as we think about that step-stone from a gross profit perspective is also really the anniversarying[sic] or moving beyond those pre-March 1 pre-orders as well that allow us to move into our current ASPs. And as we reiterated our last earnings call, we have seen $93,000 plus ASPs with the preorders that we have had post pricing change.

82.   On November 9, 2022, the Company filed with the SEC its Quarterly Report on Form 10-Q, reporting its third quarter financial results. That quarterly report was signed by Defendants Scaringe and McDonough, and contained SOX certifications, signed by Defendants Scaringe and McDonough, attesting to the accuracy of the statements contained therein. The Company also filed with the SEC a Current Report on Form 8-K, attaching its Q3 2022 Shareholder Letter as an exhibit thereto. The letter described Rivian's

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

order backlog as "robust" and stated that strong demand for the R1S and R1T provided clear visibility into future sales:

> Over the recent months, we achieved key operational and strategic milestones. Production continued to ramp on our R1 and RCV platform lines; we produced 7,363 total vehicles during the quarter representing a 67% increase as compared to the second quarter of 2022. ***We recently initiated our second manufacturing shift and remain focused on ramping production to meet the strong demand for our products.*** As we navigate through these uncertain economic times, ***we are encouraged by the strong demand for our products as evidenced by our robust preorder backlog.***

83.    During the related earnings call to discuss the 2022 third quarter financial results, Defendant McDonough announced that Rivian would no longer be publicly reporting its backlog figures, thereby closing an avenue for investors to assess demand. Defendant McDonough reiterated that ramping production was the largest lever in the Company's roadmap to achieve positive gross margins in 2024, with the other components of the roadmap being driven by other factors, such as higher average selling prices, next-generation technologies, and material cost reduction efforts:

> [A]s we've talked about in the past, we expect to see a material step change in gross margin in that walk from current state to that 2024-time frame. ***And the biggest lever, not surprisingly, is really that fixed cost leverage*** as well as our opportunity to move beyond some of the start-up-related costs that you heard [Scaringe] and myself talk a bit about that we've already seen from a process perspective, Q3 versus Q2. ***That reflects about two-thirds of the margin walk. So just wanted to make sure that you had a sense for just the magnitude of how important ramp is from an overall unit economic perspective.***
>
> The second key driver for us is associated with pricing. As we've talked about in the past, the post-March 1 configured preorders that we have in our order book reflect a $93,000 average ASP. And we've got a lot of really exciting next-generation technologies that will be coming into the fold as well that

26

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

allows us to believe that, that ASP could even drive meaningfully higher on a go-forward basis as well. So that's the second core lever in that economic walk.

And then finally, last but certainly not least, is really all of the core focus and work that we're doing right now around the reduction of our bill of materials. So importantly, the engineering and design changes and the road map we have in place to drive meaningful cost savings within that bill of materials over the next couple of years.

And then finally, all of the work that our procurement teams are doing around commercial cost-down opportunities as we continue to scale the business and importantly, work hand-in-hand with our supply chain partners and as Rivian continues to grow out its own manufacturing capacity and drive better unit economics for the business.

132.  On November 29, 2022, at the Redburn CEO Conference, Defendant Scaringe told attendees that demand was "foundational" to Rivian's business and that the Company had "a very clear line of sight through 2024" in terms of demand. Defendant Scaringe also represented that the order backlog continued to grow and that Rivian monitored order rates closely:

It's foundational to the business to make sure that demand continues to exceed our production capacity. What we've been challenged with, really, over the last year *that we've had such a large and growing demand backlog* that managing customer expectations and making sure we're communicating appropriately to customers, some of which were going to be in the backlog or a line for over 2 years. That's been a really core focus. And as we sit here today, *we have a very clear line of sight through 2024 in terms of demand, so we feel very confident about that, and we continue to see – and we talked about this on our last earnings call, we continue to see our backlog grow even as we're ramping deliveries.*

133.  On February 28, 2023, the Company filed with the SEC its annual report on Form 10-K for the 2022 fiscal year (the "2022 10-K"). The 2022 10-K was signed by

27

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Defendants Scaringe, McDonough, Boone, Schwartz, Marcario, Krawiec, Flatley, and Thomas-Graham. The 2022 10-K contained SOX certifications, signed by Defendants Scaringe and McDonough, attesting to the accuracy of the statements contained therein. In the Form 10-K statement filed for the 2021 fiscal year, the Company included a boiler-plate risk disclosure regarding the Company's ability to assess customer demand. However, the 2022 10-K differed from past years' risk disclosures by stating the following:

> Our ability to become profitable in the future will depend on the continued successful development and commercial production and acceptance of our vehicles and services, our ability to maintain strong demand and average selling prices for our vehicles, as well as our capability to manufacture our vehicle portfolio efficiently and estimate and effectively manage both our operating expenditures and our capital expenditures.

134. During the related earnings call, Defendant Scaringe reiterated that the product backlog provided Rivian with "clear demand visibility" into demand for its vehicles "well into 2024" which supported Rivian's aggressive production ramp to help it achieve positive gross margins. "In the fourth quarter, we increased production over 10,000 units. This represents a 36% increase over the third quarter of 2022. ***We maintain a vehicle backlog that provides clear demand visibility well into 2024***."

135. Defendant McDonough once again confirmed that the path for positive gross profit and gross margin relied primarily on higher production volumes, which he said accounted for about two-thirds of the expected improvement:

> We forecast reaching positive gross profit in 2024 and therefore expect by the end of 2024, we will no longer have material LCNRV [lower of cost or net realizable value] inventory charges and losses on firm purchase commitments associated with the production at our Normal plant.

***

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The most significant driver continues to be our production levels. The largest lever in our forecast is the swing from negative $1 billion of gross profit in Q4 2022 to a step change in positive gross margin in 2024.

[T]he most impactful driver is the per-unit reduction of labor overhead and ramp expenses as our large-scale plant produces a greater number of units. With the addition of our second shift, the plant in Normal is currently staffed to produce a significantly higher number of units than our current run rate. For context, these expenses represent 2/3 of the bridge from our current COGS per unit to what we expect by the end of 2024.

136.    During the call, Defendant McDonough touted the Company's production ramp, which she said would help Rivian achieve gross margin profitability:

[W]e're increasing that capacity so that 55% or call it, 85,000 units will become R1 capacity as we re-rate the lines midyear next year.

\*\*\*

And so we'll still be in a period whereby we'll be continuing to ramp out of that shutdown in midyear to produce more units in the back half of the year but it really won't be until full year 2025, where we'll be ramping up the then re-rated capacity from an R1 perspective.

137.    Defendant McDonough also confirmed that Rivian would have "85,000 units of R1 capacity" available for 2024.

138.    On April 4, 2023, at a Bank of America Automotive conference, Defendant McDonough reiterated to a financial analyst that about two-thirds of the progress towards positive gross profit would come from fixed-cost leverage achieved through greater production volume, with the remaining one-third being comprised of material-cost reductions and pricing. Once again, Defendant McDonough stressed that increasing production was the primary lever to achieve profitability.

29

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

139. On May 9, 2023, Rivian filed with the SEC a Current Report on Form 8-K, attaching a shareholder letter for Q1 2023. The letter stated that increasing production volume is the "primary" lever to Rivian's path to selling each vehicle profitability. The letter stated, in relevant part:

> ***Increasing our production volume*** as we simultaneously leverage our fixed costs at our manufacturing plant in Normal, Illinois ***is the primary lever on our path to sell each vehicle profitably***. Our 2023 production guidance of 50,000 vehicles remains on track, representing a 100% increase from 2022. While challenges remain, we have become a stronger, more agile company through this process.
>
> ***
>
> Our long-term success as a business will be determined by our ability to produce high volumes of vehicles profitably. The collective efforts across all our teams and functions are focused on delivering on this goal. Our target of generating positive gross profit in 2024 is composed of several drivers across the business. ***We expect approximately half of the improvement, excluding the impact of lower of cost or net realizable value ("LCNRV") and net losses on firm purchase commitments, will be driven by greater volume.*** Our 2023 production guidance of 50,000 units implies a doubling of capacity utilization which we believe will result in significantly lower fixed cost per vehicle, and we expect production volumes to increase further in 2024. The remaining half is split between material cost reduction and increases in average selling prices.

140. During the related sales call, held on the same day, Defendant Scaringe confirmed that the Company's "progress" on "our core value drivers of ramping production, driving costs down . . . position us well to continue executing on our goals for the remainder of the year as well as into 2024." Defendant McDonough then went on to state that Rivian continued "to target positive gross profit in 2024" with "approximately half of the improvement" driven by "greater volume and utilization of our installed capacity."

30

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Defendant McDonough further stated that: "Our 2023 production guidance of 50,000 units implies a doubling of capacity utilization, which will result in significantly lower fixed cost per vehicle, and *we expect production volumes to increase further in 2024*."

141. Defendant McDonough also spoke during the related sales call, and stated:

*I also want to take this opportunity to reiterate our gross profit bridge from Q1 2023 to Q4 2024. We continue to target positive gross profit in 2024. Excluding the impact of LCNRV and firm purchase commitments, we expect approximately half of the improvement will be driven by greater volume and utilization of our installed capacity.*

\*\*\*

*Our 2023 production guidance of 50,000 units implies a doubling of capacity utilization, which will result in significantly lower fixed cost per vehicle, and we expect production volumes to increase further in 2024*. The remaining half is split between increases in average selling prices and material cost reduction. Lower material costs will be enabled by the integration of new technologies such as Enduro and LFP battery packs which delivered about a 25% material cost reduction for our commercial vehicles in Q1 versus Q4. In addition to the engineering design-driven cost reductions we also expect to realize commercial cost savings as we negotiate with our suppliers. The increase in average selling prices is based upon the gradual improvements we expect to achieve as we complete the fulfillment of our pre-March 2022 preorder base as well as the introduction of new technologies that produced improved performance and capabilities. While gross margin is expected to remain negative in 2023, Q1 represented significant progress versus Q4 2022 with gross profit loss per delivered vehicle nearly cut in half.

142. On June 2, 2023, Defendant Scaringe attended the Sanford C. Bernstein Strategic Decisions Conference (the "Bernstein Conference") at the Company's behest. Defendant Scaringe continued to promote the Roadmap and its prescription towards

31

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

increased production, which Defendant Scaringe claimed it would take "half" of Rivian's effort.

143.    Defendant Scaringe also announced that the Company intended to "feather in" new EV orders at much higher prices in an attempt to raise the average price of Rivian's vehicles, thereby concealing the profit erosion generated by satisfying the underpriced preorders. During an exchange with an analyst from Sanford Bernstein, Defendant Scaringe further stated in relevant part:

**Defendant Scaringe**

*So the biggest driver towards healthy margin structure on R1 is volume. So if you think about the path to our target state margin profile, about half is volume.* And the reason for that is the fixed cost absorption in a large-scale plant when you're running a plant well under -- at subscale is really [sic] high deal. So that's by far away . . .

**A.M. Sacconaghi – Sanford Bernstein**

Now when you talk about fixed cost, is that depreciation? Is that overhead labor associated with that plant? Because again, at [this day], depreciation is $2,000 or $3,000 per car. So if your plant is theoretically half -- running at half capacity, maybe $5,000 or $6,000 per car, it doesn't feel like a $20,000 difference. You know what I'm saying?

**Defendant Scaringe**

Correct. So when I say a fixed, I'm bundling here for simplicity's sake. But if you think of when we're running at half capacity, the staffing -- the land layout is not set up for half the capacity. So the number of people on the line, so it's -- your variable cost is the same. So the number of people, the cost to run the plant is the same. All the nonpeople cost to run the plant remains the same. The depreciation, obviously, the overall not still the same, so it's divided by less vehicles.

*So when you put all those together, about half the reduction comes*

32

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*from volume.* Now the other half is made up of really 2 parts. One is we have a step-up in our ASP that – we're already beginning to see, and you can see this -- you'll see this quarter-over-quarter happen, but we had pricing that we'd originally announced and locked to -- or linked to, I should say, our early configured vehicles. And that early pricing had a big step-up that represents roughly another 25% of the step down -- or step down -- or step towards profitability. And we're already seeing that. ***So we're now starting at the very beginning of blending in new orders, which are much higher pricing than the older orders.***

144.   During the conference, Defendant Scaringe was asked about Rivian's confidence in the demand for its EVs. Defendant Scaringe maintained that the Company carefully and closely watched demand based on multiple data sources and continued to see "strong" demand — however, Defendant Scaringe never provided figures or sources to support the basis for his confidence. Defendant Scaringe also denied that the macroeconomic trends harming other EV manufacturers were also impacting Rivian:

**A.M. Sacconaghi – Sanford Bernstein**

Okay. And you've talked about like orders extending into 2024. Can you talk at all about sort of the rate of change of orders or backlogs in a way that makes you confident about volumes going forward?... So I'm sure you look at daily orders and ready to change your backlog. And is there anything on that, that I mean, qualitatively, I presume that's what provides some of your confidence? Is there anything on that dimension that you can share that would be helpful for investors?

**Defendant Scaringe**

No. Just -- I mean, as you said, I think we – ***we've watched the demand. I mean it is a daily thing that we watch***. We have to be careful not to overinterpret discrete events that are happening and look at enough of a time horizon to pick the true trend. But last summer, I would say it was the most extreme where you just had – demand was almost – it was off the charts. . . ***So we're watching really closely what's going to happen at the macro if that's going to introduce some major shifts, but we continue to see demand for***

33

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*the products*, and the functionality of the products helps us here. It's not like this is a 2-seat sports car that's a purely discretionary purchase.

145.    On June 15, 2023, Defendant McDonough attended the Deutsche Bank Global Auto Industry Conference (the "Deutsche Bank Conference") on behalf of Rivian.

146.    During the Deutsche Bank Conference, an analyst asked about recent developments in the Company's backlog, the main metric which analysts and investors were able to assess progress of the Company's Roadmap. Defendant McDonough answered that Rivian's strong demand remained "really stable" in light of the macroeconomic factors impacting other EV manufacturers. Defendant McDonough further assured that Rivian's backlog looked "really robust" extending into 2024. During the Deutsche Bank Conference, Defendant McDonough responded, in relevant part:

**Emmanuel Rosner**

What do you think in terms of consumer demand and receptiveness to your current pricing? So you're not disclosing your backlog anymore, but can we get some sense of demand trends you're seeing recently, any signs of consumer slowdown?

**Defendant McDonough**

*Overall, we continue to have a really robust backlog of preorders that extends into 2024.* We certainly have seen some impacts of the broader macroeconomic environment in 2023 as we compare current daily order rates relative to what we saw maybe a year ago. *But we've seen really a stable environment throughout the course of this year from a demand vantagepoint.*

147.    On July 7, 2023, INSIDEEVS reported an interview with Defendant Scaringe that discussed the Company's continued production ramp-up and business strategy. During the interview, Defendant Scaringe addressed "why Rivian ha[d not] updated its production and delivery guidance figures to more optimistic figures, considering it ha[d] a

34

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

record second quarter." Defendant Scaringe stated that he preferred to "underpromise and overdeliver so that all risk factors that could potentially disturb production are taken into account." Defendant Scaringe reiterated this philosophy throughout the interview, stating at one point that "[o]ne of the things we've gone through is just being, you know, very much thoughtful in not wanting to overpromise. We want to make sure that we overdeliver on our numbers, overdeliver on our targets."

148.    On August 8, 2023, Rivian filed with the SEC a Current Report on Form 8-K, reporting its financial results for the second quarter of 2023 (the "Q2 2023 10-Q"). That quarterly report was signed by Defendants Scaringe and McDonough, and contained SOX certifications, signed by Defendants Scaringe and McDonough, attesting to the accuracy of the statements contained therein. The Q2 2023 10-Q contained the same false and/or misleading risk disclosure as the 2022 10-K:

149.    The Q2 2023 10-Q contained a shareholder letter for Q2 2023. The letter once again stressed that increasing production was the Company's primary lever to achieve positive gross profit. The letter states, in relevant part:

> In the first half of 2023, we produced 23,387 vehicles which is in line with the production volumes we achieved for the full year 2022. ***Increasing our production is the primary lever in our path to profitability.*** The incorporation of our in-house drive units has played and will continue to play an instrumental role in improving our production ramp and cost structure.

150.    On a conference call with financial analysts and investors the same day, Defendant Scaringe stated that the Company was "quite bullish" on strong demand and that the backlog provided clear visibility into sales into 2024. Once again, Defendant McDonough stated that ramping production was the single largest driver of the path to positive growth. Likewise, Defendant Scaringe reiterated that the Company had "clear visibility" for demand for its products "deep into 2024" based on its monitoring of the Backlog.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

> *. . .[W]e feel very confident in the continued backlog that we have. We have clear visibility into -- deep into 2024 with that backlog that's established.* And as more and more vehicles are on the roads, and we now have tens of thousands of R1s on the roads, it continues to feed the flywheel of awareness about the brand. And as I said, some of our strongest advocates are people that are driving our vehicles every day. And *so we're quite bullish on the continued strong demand we have for our products.*

151. On September 7, 2023, Defendant McDonough attended the Goldman Sachs Communacopia + Technology Conference (the "Goldman Sachs Conference") on behalf of Rivian.

152. During the conference, Defendant McDonough continued to emphasize that production ramp-up continued to be the "largest single driver" to achieve profitability, stating, in relevant part:

> *First, as we look at gross profit itself, the key levers for us are continuing to ramp up production volumes within our normal production facility itself. That, as we provided in our Q1 earnings call, we provided a little bit of details or context on a bridge from where our current financial results were in Q1 to the end of 2024.* As we think about the continued scaling and production of our facility in both the ramp of R1 vehicles and continued growth of our commercial van line as well. *That's the single largest driver as we think about the path to positive gross profit for us.* The other key factors for us are driven by introductions of new technologies within the vehicle.

153. An analyst asked Defendant McDonough about how the demand metrics were faring and she responded by hyping up Rivian's strong demand, basing her claims on the product backlog, which she represented was "holding up" and "mirror[ing]" production volumes, stating in relevant part:

> *The backlog has been holding up well.* As we mentioned last quarter, we had the opportunity to have our first quarter where we had R1S production

36

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

that outpaced R1T. And that's really important for us given the broader backlog for our vehicles have always been more heavily weighted towards S. *And so we are now in a position to have our production volumes mirror or match more closely with the backlog that we have from a demand standpoint.* And so we're excited about bringing more and more vehicles to market. Actually one of the biggest inhibitors to purchase or the reason why someone cancels is wait time. So we're excited to continue to work through that backlog, get more of the community out there growing and building awareness and excitement for the vehicles and the brand as well.

154. On September 14, 2023, Defendant Scaringe participated in the Morgan Stanley Laguna Conference (the "Morgan Stanley Conference") on behalf of the Company. During the Morgan Stanley Conference, Defendant Scaringe continued to stress the importance of increasing production to achieve profitability:

And we've got a few big objectives, which I'll ladder into. I'm sure some of the core questions you're thinking about. *But number one, we continue to focus on ramping production.* And the ramping of production for our first set of products are flagship consumer products, R1T and TVNOS, which Adam is referring to, along with our commercial vans.

*That's really critical to achieve the level of fixed cost leverage or fixed cost absorption we need on the pathway to profitability* in our Normal facility . . .

155. Defendant Scaringe also represented that demand remained "very strong" and the fact that customers had to wait a year to have their backlog orders fulfilled was a "good problem" to have, he stated in relevant part:

*So we continue to see very strong demand backlog.* We have market-leading residual values. If you buy our R1S today, you can sell it tomorrow for more than you bought it for. If you order an R1S today, you're not going to get until the end of next year. That's a problem but a high-class problem. *It's a good problem to have.*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

156.   On November 7, 2023, Rivian filed with the SEC a Current Report on Form 8-K, reporting its financial results for the third quarter of 2023 (the "Q3 2023 10-Q"). That quarterly report was signed by Defendants Scaringe and McDonough, and contained SOX certifications, signed by Defendants Scaringe and McDonough, attesting to the accuracy of the statements contained therein. The Q3 2023 10-Q contained the same false and/or misleading risk disclosure as the 2022 10-K and Q2 2023 10-Q.

157.   On the same day, the Company hosted an earnings call to discuss its financial results for the third quarter of 2023. The conversation focused on the progress Rivian was supposedly making on its Roadmap. A Goldman Sachs analyst asked whether the Company was still on track for positive margins in 2024, and whether anything changed with respect to the Roadmap given the macroeconomic environment.

> This is just such an important topic. And ultimately, there's – I just spoke to it a bit, **but there's a few major levers. The first being, the continued ramp-up of our production facility and the fixed cost absorption that comes with that.** We're seeing the benefits of that quarter-over-quarter as we continue to ramp. So it's numerically very easy to understand.
>
> The second, which is maybe less – it's not as easy to see without having a look into all of our supplier negotiations and discussions is the significant progress we're making contractually with redefining build material costs or material costs through negotiations with suppliers, through re-sourcing of new  suppliers, or through changes to the component or system design to achieve those cost reductions . . . .
>
> And then lastly. . . that's going to be both due to the layering in or the feathering in of new pricing, deliveries are associated with new pricing, meaning post March 1, 2022, as we work through that. . . **So it's a combination of ramp, material cost and ASP that give us a high degree of confidence in our long-term gross margin for the business**.

158.   The statements discussed above were materially false and/or misleading when made because, among other things: (1) the Company overstated its ability to survive

38

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

negative, near-term macroeconomic impacts, including an increase in interest rates and supply chain disruptions; (2) due to these impacts, the Company's business was experiencing diminished demand for its products and an increase in preorder cancellations; (3) consequently, Rivian's order backlog faced significant deterioration; (4) the backlog was not a valid proxy for EV demand, or even a reliable indicator of demand; (5) the Company dramatically overstated its ability to ramp EV production at the Normal plant; (6) due to the foregoing, Rivian's stated expected earnings and vehicle productions goals for 2024 were false and/or misleading; and (7) the Company failed to maintain internal controls.

**The 2023 Proxy Statement**

159.  On May 1, 2023, the Company filed a proxy statement on Schedule 14A with the SEC (the "2023 Proxy Statement"), soliciting shareholder votes to, among other things, re-elect Defendants Boone and Marcario to the Board and approve executive compensation. The 2023 Proxy Statement was issued by the Board and signed by Defendant Scaringe.

160.  The 2023 Proxy Statement makes the following representations with respect to the Company's risk exposures:

> Risk assessment and oversight are an integral part of our governance and management processes. Our Board of Directors encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. Management discusses strategic and operational risks at regular management meetings and conducts specific strategic planning and review sessions during the year that include a focused discussion and analysis of the risks we face. Throughout the year, senior management reviews these risks with the Board of Directors at regular Board of Directors meetings as part of management presentations that focus on particular business functions, operations, or strategies, and presents the steps taken by management to mitigate or eliminate such risks. Our Board of Directors does not have a standing risk management committee, but rather administers this oversight function directly through the Board of Directors as a whole, as

39

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

well as through various standing committees of the Board of Directors that address risks inherent in in their respective areas of oversight.

161. The 2023 Proxy Statement further represents that the Audit Committee ". . . is responsible for overseeing our major financial risk and enterprise exposures and the steps our management has taken to mitigate such exposures, including the structure, design, adoption, and implementation of our risk management policies and internal control systems."

162. The foregoing statements in the 2023 Proxy Statement were false and misleading and omitted material information. Specifically, the Board was required, but failed to: (i) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Rivian's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, including its production capabilities and ability to accurately price its vehicles; (ii) effectively oversee and monitor the material risks facing the Company such as the risk of the cancellation of unfulfilled pre-orders as well as macroeconomic risks; and (iii) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

**The Truth is Revealed**

163. On February 21, 2024, Rivian announced its financial results for the fourth quarter and full year of 2023 and published its quarterly shareholder letter (the "2023 Shareholder Letter"). The 2023 Shareholder Letter was attached as an exhibit to a Form 8-K, which was signed by Defendant McDonough. In the 2023 Shareholder Letter, Rivian announced that it would produce a mere 57,000 EVs in 2024. This production estimate was less than the 57,232 EVs produced in 2023, and far short of the Company's internal production figure of 62,000 EVs. In other words, while the Individual Defendants

40

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

repeatedly represented that Rivian would ramp up its production, the Company was instead decreasing production.

164. On that same day, Rivian held its quarterly investor conference call for the fourth quarter and full year of 2023. During the call, the Individual Defendants stunned investors by dramatically changing the Company's touted growth roadmap by materially slashing the role of increased production to achieve gross margins and profitability in 2024, a component that was repeatedly touted as the core lever for the Company's positive gross margins. Instead, the Company announced that the new "key driver" was saving on "variable" costs which would now amount to 50% of the newly rewritten roadmap. The remaining 50% would then be comprised of improved efficiency in the Normal Facility, and non-vehicle revenue, which would represent 35% and 15% of the roadmap, respectively.

165. Defendant McDonough's surprise admission stands in stark contrast with the repeated assurances reiterated by Rivian through the previous quarters. Worse yet, this sudden shift away from production signaled another key issue — a lack of demand.

166. During the same call, Defendant Scaringe also admitted that demand for Rivian's EVs had been "negatively impacted," and that the supposedly "robust" backlog was not dwindling largely due to "the impact of cancellations" which was supposedly watched daily. Defendant Scaringe then went on to state that this newly weakened demand, which somehow spawned in the span of one quarter, was due to macroeconomic pressures such as high interest rates. Defendant Scaringe stated, in relevant part:

> Our business is not immune from existing economic and geopolitical uncertainties. Most notably, the impact of historically high interest rates, which has negatively impacted demand. In this fluid environment, we appreciate the expressed interest in demand visibility from the investment community.

41

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

167.   In contrast to prior statements from the Company pivot, Defendant Scaringe announced that Rivian would "reduce the number of salaried employees by approximately 10%" instead of improving gross margins by increasing productivity. In other words, Rivian was attempting to improve gross margins by shrinking both its EV production and workforce.

168.   On this news, Rivian's stock price plunged $3.94 per share, or more than 25%, to close at $11.45 per share on February 22, 2024.

***Rivian Is Sued in the IPRS Lawsuit***

169.   On May 31, 2024, the *IPRS* Action was filed against the Company and Defendants Scaringe and McDonough. According to the amended complaint filed on December 10, 2024, the class plaintiff alleged that Rivian and Defendants Scaringe and McDonough violated Section 10(b) of the Exchange Act and the officer defendants violated Section 20(a) of the Exchange Act by, among other things, falsely assuring investors that Rivian was on track to achieve 2024 profitability due to strong EV demand and increase production, while in truth, the Company concealed weakening demand and macroeconomic pressures. On August 20, 2025, the Court denied the defendants' motion to dismiss the amended complaint, holding that the plaintiff had stated a claim as to both the Section 10(b) and 20(a) claims. *See IPRS* Action, ECF No. 76. In doing so, the Court explained that the plaintiff "sufficiently plead falsity to survive the motion to dismiss stage because the statements created an impression of a state of affairs that differed in a material way from what actually existed," and "plausibly allege Defendants made positive statements about increases in demand based on the preorder Backlog which was allegedly misleading to investors." *Id*. at 5-7. Then, on January 22, 2026, the Court also denied the defendants' motion for judgment on the pleadings, writing that it "cannot find as a matter of law that Defendants' alleged statements would not mislead a reasonable investor." *See IPRS* Action, ECF No. 94.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

170.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

171.   Rivian is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

172.   Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

173.   Plaintiff is an owner of Rivian stock and has been a continuous holder of the Company's common shares at all relevant times.

174.   A pre-suit demand on the Board is futile and therefore, excused. At the time this suit was filed, the Board consisted of the following individuals: Defendants Scaringe, Krawiec, Schwartz, Boone, Flatley, and Krafcik (the "Director Defendants"). The Board also consisted of non-party director Gomez. Plaintiff is required to show that a majority of directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, none of the Board's current directors are capable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

175.   Each of the Director Defendants faces a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants

43

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

176. The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

177. The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

**A. Defendants Boone, Flatley, and Krafcik Are Not Disinterested Because They Were Members of the Audit and Finance Committee.**

178. Defendants Boone, Flatley, and Krafcik either serve, or have served during the Relevant Period, as members of the Audit and Finance Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent or correct the issuance of material misstatements and omissions regarding material deficiencies in the Company's accounting practices as alleged above. Therefore, Defendants Boone, Flatley, and Krafcik cannot independently consider any demand to sue

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

**B. The Director Defendants are Not Independent.**

179. The Director Defendants received, and most continue to receive, substantial compensation for their roles as Company directors. In addition, the Director Defendants solicited the false and misleading 2023 Proxy Statement, which led to Defendants Boone and Marcario being re-elected to the Board, allowing them to continue breaching their fiduciary duties to the Company. As trusted Company directors, they conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For these reasons, the Director Defendants, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

180. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

181. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

182. The Director Defendants may be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Rivian. If there is a liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Rivian, there would be no insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

183. If there is no liability insurance, then the Director Defendants will not cause Rivian to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

184. Accordingly, for all the reasons set forth above, a majority of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT I

***Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9)***

46

185.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

186.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

187.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that:

It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

188.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

189.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2023 Proxy Statement filed with the SEC. As alleged above, this filing contained materially false and misleading statements concerning the financial wellbeing of the Company. Specifically, the 2023 Proxy Statement was materially false and misleading because it failed to disclose, *inter alia*: (i) the Individual Defendants' failure to implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Rivian's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and

47

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

business prospects, including its production capabilities and ability to accurately price its vehicles; (ii) the Individual Defendants' failure to effectively oversee and monitor the material risks facing the Company; and (iii) the Individual Defendants' failure investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

190.    The misrepresentations and omissions in the 2023 Proxy Statement were material to Company stockholders in voting on the matters set forth for stockholder determination in the 2023 Proxy Statement, including, but not limited to, the approval of the re-election of Defendants Boone and Marcario.

191.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

192.    As a result of the Individual Defendants' material misrepresentations and omissions, the Company has sustained significant damages.

## COUNT II

*Against the Individual Defendants for Contribution Section 21D of the Exchange Act*

193.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

194.    The conduct of Defendants Scaringe and McDonough as described herein has exposed the Company to significant liability under various federal securities laws by their misconduct.

195.    Rivian and Defendants Scaringe and McDonough were named as defendants in the related *IPRS* Action that alleged and asserted claims arising under the federal securities laws. Rivian is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.

196.    If Rivian is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless

48

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

acts or omissions of Defendants Scaringe and McDonough as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. Rivian is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

197.    As officers and directors, Defendants Scaringe and McDonough had the power or ability to, and did, control or influence, either directly or indirectly, Rivian's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

198.    The Individual Defendants are liable under §21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

199.    Defendants Scaringe and McDonough have damaged the Company and are liable to the Company for contribution.

200.    As such, Rivian is entitled to receive all appropriate contribution or indemnification from Defendants Scaringe and McDonough.

## COUNT III

### *Against the Individual Defendants for Breach of Fiduciary Duty*

201.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

202.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

203.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

49

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

204. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

205. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the Individual Defendants failed to implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Rivian's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, including its production capabilities and ability to accurately price its vehicles; (ii) the Individual Defendants did not effectively oversee and monitor the material risks facing the Company such as the hazard of cancelled pre-orders from the backlog; and (iii) the Individual Defendants did not investigate or take action when presented with red flags regarding misconduct or the lack of internal controls.

206. The Individual Defendants had actual knowledge that the Company's internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

50

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

207.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, and as a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself and paying settlement costs in the *Crews* Action, exposing the Company to millions of dollars in potential class-wide damages in the *IPRS* Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

208.    Plaintiff, on behalf of Rivian, has no adequate remedy at law.

## COUNT IV

### *Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty*

209.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

210.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

211.    Plaintiff, on behalf of Rivian, has no adequate remedy at law.

## COUNT V

### *Against the Individual Defendants for Unjust Enrichment*

212.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

213. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Rivian.

214. Plaintiff, as a shareholder and a representative of Rivian, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

215. Plaintiff, on behalf of Rivian, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Awarding punitive damages;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: April 16, 2026                    Respectfully submitted,

52

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**THE ROSEN LAW FIRM, P.A.**

/s/Laurence M. Rosen

Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **VERIFICATION**

I, Andrew Schamaun am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

4/10/2026

DocuSigned by:

AS

F3550BC2ABBD46A

Andrew Schamaun